

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

————————————————

## No. 08-24-00146-CR

————————————————————

### EDUARDO SANTILLANA GARZA, Appellant

### v.

### THE STATE OF TEXAS, Appellee

On Appeal from the 409th District Court
El Paso County, Texas
Trial Court No. 20190D02537

## MEMORANDUM OPINION

Following a jury trial, Appellant Eduardo Santillana Garza was convicted of one count of capital murder in the shooting death of Miguel Rivera, Sr., which the State alleged occurred during the course of committing or attempting to commit (1) burglary of a habitation, (2) burglary of a building, or (3) aggravated robbery. Garza was also convicted of one count of aggravated robbery,

in which the State alleged that he shot Abelardo Moreno while committing a theft. The trial court sentenced Garza to life in prison without the possibility of parole for the capital murder conviction and 40 years' imprisonment for the aggravated robbery conviction, with the sentences to run concurrently.[1]

On appeal, Garza contends the trial court erred by denying his request for a lesser-included instruction on the offenses of burglary of a building and burglary of a habitation. Finding no error, we affirm the trial court's judgment.

## I. FACTUAL BACKGROUND

Miguel Rivera, Sr. owned a ranch in Tornillo, Texas with several structures on it, including a trailer where he resided prior to his death. At trial, his son, Miguel Rivera, Jr., testified that Rivera, Sr. had hired Garza two or three months before the shooting to assist him with remodeling his trailer, and as part of Garza's compensation, he allowed Garza and his girlfriend to live in a separate trailer on the property. Rivera, Jr. recalled that his father terminated Garza several days before the shooting because tools had begun to disappear from the property and Garza would frequently fail to appear for work. Rivera, Jr. helped his father ensure Garza and his girlfriend left the property, and he recalled that shortly thereafter, on July 9 and 10, 2018, Garza sent Rivera, Sr. a series of text messages expressing anger over being forced to leave.[2]

---

[1] "An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for . . . life without parole, if the individual committed the offense when 18 years of age or older." Tex. Pen. Code Ann. § 12.31(a)(2),

[2] The text messages, which were introduced in evidence at trial, stated:

What the hell am I being kicked out for . . .

So was there a good reason to kick me out the way u did . . . w[ith]out any good explanation . . . that was a cowardly way of getting me out. [A]nd my lady was asking me if the futon u gave her if she can go for it[.]

Rivera, Sr. thereafter hired Abelardo Moreno to assist him with the remodel. Moreno was aware that Rivera, Sr. had terminated another worker who had been living on the property a "few days" before he was hired, but Moreno had never met or spoken with Garza.

## A. The shootings

At trial, Moreno testified that he was at Rivera, Sr.'s ranch on the morning of July 25, 2018, to assist him with various chores, including cleaning the inside of his black Nissan truck. After cleaning the truck, Moreno followed Rivera, Sr. into an older adobe house on the property, which he believed had previously been used as a residence but was now being used primarily for storage. As they entered the house, Moreno witnessed Rivera, Sr. suddenly raise his hands and fall to the ground. Moreno thereafter observed a man sitting down in the house dressed all in black with a mask covering his entire face. He recalled the man was pointing a gun, which he described as a black revolver, at him. On either side of the man, Moreno saw a black "tool" bag with handles.

Although Moreno asked him not to shoot, the man shot Moreno in the neck and told him not to get up or he would shoot him again. When the man asked if anyone else was on the property, Moreno replied in the negative. The man then asked Moreno where the keys were to the "little truck" parked outside, which Moreno understood to mean Rivera, Sr.'s black Nissan. Moreno told him the keys were in the ignition. The man told Moreno not to get up until he could no longer hear the sound of the truck. The man took Moreno's cell phone and left the house. According to Moreno, no one else was in the house at the time of the shootings.

I'm going to keep at it and at it until I am told why the hell I got kicked out in the way I did . . . and when I can get the futon u gave my lady. Not for me. But I hurt my back taking it out [of] ur house and u said it was hers.

Moreno testified that he initially thought the shooter might have been Rivera, Jr. because the man was the same approximate size, but after hearing his voice, Moreno "realized that it was not him." However, Moreno did not recognize the man or his voice.

After the man left, Moreno used Rivera, Sr.'s cell phone to call Rivera, Sr.'s daughter—the first number that he found in the phone—to alert her to the shooting. Cell phone records later obtained by police indicated the call occurred at 8:36 that morning. Because the daughter did not know the address of the ranch, she called Rivera, Jr. for help.

Rivera, Jr. testified that he was at the home of his friend, Victor Gandara, in Fabens, Texas, approximately 15 miles away when he received his sister's call. He drove with Gandara to the ranch, calling 911 on the way. When he arrived, he heard Moreno calling for him inside the adobe home. Upon entering, he saw his father lying in a pool of blood with what appeared to be a gunshot wound to his head. He noticed at the time that his father's Nissan truck was missing.

Paramedics arrived shortly thereafter and transported both Moreno and Rivera, Sr. to the hospital where Rivera, Sr. was pronounced dead. An autopsy revealed that Rivera, Sr. died of a gunshot wound to his forehead and that the barrel of the gun was either in contact with or within an inch or two of his forehead when it was fired. The medical examiner's office ruled Rivera, Sr.'s death a homicide by a gunshot wound to the head. Moreno was treated at the hospital for his gunshot wound and was still experiencing difficulties with his throat at the time of trial.

## B. Law enforcement's investigation

After law enforcement officers arrived at the scene, Rivera, Jr. informed them that he suspected Garza may have been the shooter based on Garza's prior dealings with his father and the text messages he had sent him. Rivera, Jr. also informed them that Garza was the only person he knew who had "an issue" with his father.

4

That same morning, the police located Rivera, Sr.'s Nissan truck at an apartment complex in Fabens. After speaking with individuals at the apartment complex, the police determined that Garza was at the home of Gloria Chavez, approximately a half mile away.

Chavez testified at trial that Garza was a friend of her neighbor, Saul Cortez, and that she had previously interacted with Garza when he visited Cortez. She recalled that at approximately 10:30 or 11:00 a.m. the morning of the shooting, she saw Garza walking out of Cortez's backyard. Because Cortez and Garza were friends, she did not find this unusual. Chavez recalled that she and Garza thereafter began a conversation, and he was sitting on her front porch when deputies arrived later that day to arrest him.

That same morning, law enforcement officers conducted a full search of Cortez's property. They discovered a box in Cortez's backyard containing a black bag that matched the description of the bags Moreno reported seeing in the adobe home next to the shooter.[3] The bag contained a black Ruger .22-caliber revolver with an eagle emblem on the handle as well as two fired casings and four unfired rounds. The bag also contained a Sony car stereo, several knives, a red bandanna, and Crown Royal bags—of the type Rivera, Jr. testified his father frequently used to store items.

A firearm expert testified at trial that he compared the ammunition remaining in the revolver with the projectiles recovered from Rivera, Sr.'s body and from Moreno's neck. Although the results were inconclusive, the expert testified that the recovered projectiles were .22-caliber bullets "similar" to the ones found in the revolver. He concluded that it was therefore possible that the revolver had been used to shoot Rivera, Sr. and Moreno.

At trial, Rivera Sr.'s brother-in-law testified that he had gifted Rivera, Sr. a black revolver identical to the one found in the black bag. As well, Rivera, Jr. testified that he knew Rivera, Sr.

---

[3] The black bag was 10–20 yards from where Garza was found at the time of his arrest.

kept a .22-caliber black revolver with an eagle emblem on it in his trailer bedroom, along with several knives. He testified that he had seen Garza in Rivera, Sr.'s bedroom when Garza was working on the remodel. A friend of Rivera Sr.'s testified that he recognized the knives and the car stereo in the black bag as items he had sold to Rivera, Sr.

Subsequent testing revealed Garza's DNA on the bandanna, and Garza's fingerprints on the car stereo and a photograph found in the black bag. Garza's fingerprints also matched a fingerprint found on a folder in the black Nissan truck's glove compartment. However, no interpretable DNA or fingerprints were found on the revolver.

After obtaining a search warrant, the police seized Garza's cell phone and provided it to an FBI expert in mobile-device-location analyses who performed a cell-site analysis to determine the phone's pinging locations during the timeframe of the shooting. The results indicated that between 9:18 p.m. on July 24, 2018, and 12:18 a.m. on July 25, 2018, Garza's cell phone pinged off a cell tower that covered a geographic area encompassing the shooting scene. However, there was no mappable data for the cell phone's location between 12:18 a.m. and 9:01 a.m. on July 25 because the cell phone had either been turned off or was not connected to the network. But at 9:01 a.m., less than 30 minutes after Moreno called Rivera, Sr.'s daughter to report the shooting, Garza's cell phone began pinging off two cell towers in the vicinity of the ranch (near Fabens and the northeastern portion of Tornillo).

## II. PROCEDURAL HISTORY

### A. Garza's indictment

Garza was indicted in May 2019 on one count of capital murder in Rivera, Sr.'s death, in which the State alleged that on July 25, 2018, Garza intentionally caused the death of Rivera, Sr. by shooting him with a firearm while Garza was in the course of committing or attempting to

commit (1) burglary of a habitation, (2) burglary of a building, or (3) aggravated robbery. Garza was also indicted on one count of aggravated robbery, in which the State alleged that while Garza was in the course of committing theft, and with the intent to obtain or maintain control over property, Garza intentionally, knowingly, or recklessly caused bodily injury to Moreno by shooting him with a firearm.

## B. Garza's defensive theory at trial

Following the State's case, in closing arguments, defense counsel argued there was reasonable doubt that Garza was the person who shot the two victims, and sought to instead cast blame on Rivera, Jr., claiming he had at least two motives for killing his father. Defense counsel pointed out that Rivera, Jr. had testified that (1) his father had informed him three or four weeks before the shooting that he was removing him as a beneficiary of his estate, and (2) his mother had been arrested for embezzlement and needed $10,000 in bail money.[4] Defense counsel argued that law enforcement allowed Rivera, Jr. to "direct" the investigation by convincing them Garza was the shooter, and law enforcement consequently did not conduct a proper investigation. Defense counsel further pointed out that although Gandara had indicated that Rivera, Jr. was with him at his residence the morning of the shooting, Gandara acknowledged at trial that he lived on the same block where Rivera, Sr.'s truck was found in Fabens.

In addition, defense counsel pointed out that because the evidence established that Garza had driven the Nissan truck when employed at the ranch, it was not surprising that his fingerprints were found in the truck. Defense counsel also criticized law enforcement's evidentiary handling of the fingerprints and DNA testing, contending the evidence had been "contaminated" due to their negligence. Finally, defense counsel argued it was unclear how long the items found on Cortez's

---

[4] Rivera, Jr. testified that his father told him two weeks later that he intended to put him "back as [a] beneficiary," but he failed to do so before his death and instead left his entire estate to his daughters.

property had been there, and there was no testimony showing the items had been taken from the ranch the day of the shooting.

## C. Garza's request for a lesser-included-offense instruction

At the charge conference, defense counsel asked the trial court to submit a lesser-included-offense instruction that would have allowed the jury to find Garza guilty of the lesser offenses of "Burglary of Habitation [or] Burglary of a Building" as an alternative to the capital murder charge. In support of the request, defense counsel argued it was possible that the items were stolen from the property on an earlier occasion, and a "reasonable jury" could conclude that although Garza was guilty of committing burglary in a "separate incident," the murder may have been committed by someone else.[5] The trial court denied the request.

## D. The jury's verdict and the denial of Garza's motion for new trial

The jury convicted Garza of both crimes as alleged in the indictment. Garza moved for a new trial, arguing the trial court erred when it refused to provide the jury with his requested lesser-included-offense instruction.[6] The motion was overruled by operation of law, and Garza appealed from his judgment of conviction.

---

[5] In his request, defense counsel stated:

> I would like to point out that in support of the Burglary of a Habitation the evidence submitted at trial includes that our defendant was located at the property at the corner of North Fabens and G Street behind which there were items that through other testimony were alleged and some proof that–some evidence that they had been stolen from the residence of the decedent. And, Your Honor, the–so in the event that the jury finds that that property indeed was stolen, but was not that stolen–but that he was not the shooter, because it is quite possible with the evidence in this case that that theft–those items were stolen in a separate incident. He was on the property for two months living and working. So, if the evidence does provide a jury with a reasonable–a reasonable jury can conclude that the evidence we have that that property was stolen separately well before the date of the murder. And the murder was committed separately potentially by another individual.

[6] In his motion, Garza asserted that at trial, his attorney requested a lesser-included-offense instruction on "burglary of a habitation, burglary of a building and murder (non-capital)." However, the record does not reflect that defense counsel requested such an instruction on the offense of murder. On appeal, Garza only addresses the trial court's failure to instruct the jury on the two burglary offenses.

## III. ISSUE ON APPEAL

In his sole issue on appeal, Garza maintains the trial court erred when it denied his request for a lesser-included-offense instruction on the offenses of Burglary of a Building and Burglary of a Habitation.

## IV. DISCUSSION

### A. Standard of review and applicable law

We review a trial court's refusal to submit a lesser-included-offense instruction to the jury for an abuse of discretion. *See Chavez v. State*, 666 S.W.3d 772, 776 (Tex. Crim. App. 2023). We apply a two-part test in determining whether a defendant was entitled to a such an instruction. *Id*. In the first step, "we compare the statutory elements of the alleged lesser offense with the statutory elements of the greater offense and any descriptive averments in the indictment." *Id*. "If proof of the lesser offense is included within proof of the greater offense, the first step has been satisfied." *Id*. (citing Tex. Code Crim. Proc. art. 37.09(1)).

In the second step, we review the record to determine if there is "evidence from which a rational jury could find the defendant guilty of only the lesser offense." *Id*. (citing *Guzman v. State*, 188 S.W.3d 185, 188–89 (Tex. Crim. App. 2006)). As the Court of Criminal Appeals has explained, the "guilty-only requirement is met if there is affirmative evidence of a factual dispute that raises the lesser offense and rebuts or negates other evidence establishing the greater offense." *Id*. (citing *Roy v. State*, 509 S.W.3d 315, 319 (Tex. Crim. App. 2017)). "It does not matter if the factual dispute is based on direct or circumstantial evidence so long as a rational jury could interpret the record in a way in which it could find the defendant guilty of only the lesser-included offense." *Id.* Even a scintilla of evidence is sufficient to fulfill this requirement, no matter how controverted or incredible the evidence may be, as long as the evidence is "directly germane to the

lesser included offense" and presents the lesser-included offense as a "valid, rational alternative to the greater offense." *Id.* at 777 (citing *Goad v. State*, 354 S.W.3d 443, 446, 448 (Tex. Crim. App. 2011)).

However, the court has cautioned that "[m]eeting this threshold requires more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012). Further, "the mere disbelief of evidence establishing commission of the greater offense is insufficient by itself to justify submission of a [lesser-included-offense] instruction . . . because the disbelief of evidence is not evidence." *Chavez*, 666 S.W.3d at 777.

In reviewing a court's denial of a lesser-included-offense instruction, we review the evidence in the light most favorable to the requested instruction. *Hernandez v. State*, 631 S.W.3d 120, 123 (Tex. Crim. App. 2021).

### B. Analysis

#### (1) Step one: burglary is a lesser-included offense of capital murder

In the first step in our analysis, we compare the elements of capital murder, as alleged in the indictment, with the elements of burglary of a habitation or building. A person commits capital murder if: (1) he commits murder as defined under Texas Penal Code Ann. § 19.02(b)(1); and (2) he intentionally commits the murder while in the course of committing or attempting to commit one of the enumerated felony offenses, including burglary and robbery. *See* Tex. Penal Code Ann. § 19.03(a)(2). Section 19.02(b)(1) provides that a person commits murder if he "intentionally or knowingly causes the death of an individual." *Id.* § 19.02(b)(1). As alleged in the indictment, Garza was charged with committing capital murder in the course of committing or attempting to commit burglary of a habitation or building, as well as robbery.

A person commits burglary, if "without the effective consent of the owner, the person: (1) enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a felony, theft, or an assault; or (2) remains concealed, with intent to commit a felony, theft, or an assault, in a building or habitation; or (3) enters a building or habitation and commits or attempts to commit a felony, theft, or an assault." *Id.* § 30.02(a) (1–3). The Code defines the term "enter" to mean "to intrude: (1) any part of the body; or (2) any physical object connected with the body." *Id*. § 30.02 (b).

In general, when a person is charged with capital murder, alleging that he committed murder in the course of committing or attempting to commit a burglary, the burglary is considered a lesser-included offense of the capital murder charge. *See Ex Parte Castillo*, 469 S.W.3d 165, 170 (Tex. Crim. App. 2015). As the Court of Criminal Appeals has explained, when a defendant is charged with capital murder committed in the course of a burglary, "the burglary charge is a lesser-included offense of capital murder as pled because, to establish capital murder, the State needed to prove no more than the [burglary] (or attempted [burglary]) . . . plus additional facts." *Id.* at 170; *see also Smith v. State*, No. 14-07-00671-CR, 2008 WL 3931632, at *3 (Tex. App.—Houston [14th Dist.] Aug. 21, 2008, pet. ref'd) (mem. op., not designated for publication) (recognizing that for purposes of the first step of the analysis, burglary can be a lesser-included offense of capital murder when a defendant is charged with committing murder in course of committing a burglary). To prove Garza committed capital murder, as pled in the indictment, the State needed to prove no more than he committed a burglary or attempted burglary plus additional facts. Accordingly, we conclude that the first step in the analysis was satisfied.

**(2) Step two: no evidence that Garza only committed burglary**

In the next step, we consider whether the record contains affirmative evidence of a factual dispute from which a reasonable juror could have concluded that, if guilty, Garza was only guilty of burglary and not capital murder as alleged in the indictment. We find no such evidence.

As the State points out, the evidence at trial demonstrated that only one person was in the adobe house at the time of the shooting. The evidence further established that the same person had black bags by his side, and a bag matching the description given by the only witness to the offense was later found to contain several items stolen from the ranch. Therefore, it was undisputed that the person who shot Rivera, Sr. was the same person who was committing or attempting to commit burglary at the time of the shooting as alleged in the indictment. Moreover, the autopsy report showed that Rivera, Sr. was shot with a gun either in contact with his forehead or within an inch or two away, thereby satisfying the intent element of capital murder. *See Balderas v. State*, 517 S.W.3d 756, 766–67 (Tex. Crim. App. 2016) (recognizing that "the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill").

Accordingly, nothing in the record would have allowed a reasonable jury to conclude that if Garza was guilty, he was only guilty of committing burglary at the time the shooting took place, and not capital murder. *See, e.g.*, *Banda v. State*, 890 S.W.2d 42, 60–61 (Tex. Crim. App. 1994) (en banc) (holding that defendant accused of capital murder based on the commission of murder in the course of committing a burglary was not entitled to an instruction on the lesser-included offense of burglary where the evidence demonstrated that he had the 74-year old victim's blood on his clothing, he bragged that he had "killed an old lady," and there was nothing in the record to demonstrate that he did not commit the murder despite evidence that this brother may have been present at the scene).

Garza, however, contends it was possible he committed a separate burglary on Rivera Sr.'s property in the days prior to the shooting. He argues that there was nothing in the record to suggest when the items were taken, and in turn, a reasonable jury could have concluded that a different person committed the actual shooting on the morning of July 25. Therefore, he maintains, a reasonable jury could have concluded that if he was guilty, he was only guilty of committing that burglary.

As the State points out, however, Garza's argument contains a fundamental flaw because any burglary that may have occurred at a separate time, while perhaps a "lesser" offense of capital murder, was not an "included" offense of the capital murder offense as charged in the indictment. The Court of Criminal Appeals explained this distinction in *Hernandez v. State*, 631 S.W.3d 120 (Tex. Crim. App. 2021). There, the defendant was charged with aggravated sexual assault of a child by penetrating the child's mouth with his penis. *Id*. at 122. At trial, he denied penetrating the child's mouth with his penis but admitted that he had touched the child with his penis and had touched her vagina with his fingers. *Id.* He then sought a lesser-included-offense instruction on indecency with a child based on his admitted acts of touching. *Id.* The high court concluded that the trial court properly denied the request, recognizing that although indecency with a child by touching may be a "lesser" offense of aggravated sexual assault, the two separate acts of touching to which the defendant admitted were not "included" in the charged offense, as the charge only alleged a penetration of the child's mouth. *Id*. at 122, 125. Thus, as the court explained, the two acts of touching constituted "separate" or "extraneous" offenses not included in the charged offense, and the defendant was therefore not entitled to rely on those acts to request a lesser-included-offense instruction. *Id*. at 125; *see also Hayward v. State*, 158 S.W.3d 476, 480 (Tex. Crim. App. 2005) (recognizing that the conduct comprising a lesser-included offense must

13

be "included within the conduct charged in the indictment"). In other words, "an extraneous offense cannot logically be a lesser-included offense." *Campbell v. State*, 149 S.W.3d 149, at 154 n.1 (Tex. Crim. App. 2004) (en banc).

In explaining this concept in the context of capital murder, we find our sister court's opinion in *Smith* highly instructive. *See Smith v. State*, No. 14-07-00671-CR, 2008 WL 3931632, at *3–4 (Tex. App.—Houston [14th Dist.] Aug. 21, 2008, pet. ref'd) (mem. op., not designated for publication). In *Smith*, the defendant was charged with capital murder, alleging that he caused the death of his victim while committing or attempting to commit burglary of a habitation on December 9, 2005. *Id*. at *2. The defendant argued he was entitled to a lesser-included-offense instruction on burglary of a habitation because the jury could have found that he "only burglarized the [victim's] apartment on December 8, 2005, and that someone else committed the burglary and murder on December 9, 2005." *Id.* at *3. The court rejected that argument, pointing out that any burglary that may have been committed the day before the murder was not the same burglary alleged in the indictment to support the capital murder charge; in other words, it was a distinct offense for which the defendant could have been tried separately. *Id*. at *4 (citing *Hayward*, 158 S.W.3d at 479–80 (concluding that appellant, who was charged with murder by stabbing her victim with a knife or a piece of glass, was not entitled to a lesser-included-offense instruction on assault based on her claim that she merely struck the victim with her fists while another individual stabbed the victim, where striking the victim with her fists constituted a separate offense from that charged in the indictment); *Campbell v. State*, 149 S.W.3d at 155–56 (holding that defendant who was charged with possession of a controlled substance of a certain amount with the intent to deliver was not entitled to a lesser-included-offense instruction for simple possession where he claimed to

have possessed a smaller amount of narcotics at a different location than that charged in the indictment)).

Here, too, we conclude that because Garza was charged by indictment with capital murder for shooting Rivera, Sr. while committing or attempting to commit a burglary on July 25, 2018, he was not entitled to a lesser-included-offense instruction for the commission of a burglary that may have occurred on a different date, as any such offense would constitute a separate or extraneous offense not included in the indictment. *See Bufkin v. State*, 207 S.W.3d 779, 783 (Tex. Crim. App. 2006) (recognizing that a "defendant cannot foist upon the State a crime the State did not intend to prosecute in order to gain an instruction on a defensive issue or a lesser-included offense").

Garza's sole issue on appeal is overruled.

## V. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

LISA J. SOTO, Justice

September 23, 2025

Before Salas Mendoza C.J., Palafox and Soto, JJ.

(Do Not Publish)

15